**Ralph ELAM, Plaintiff,**

v.

**MONTGOMERY COUNTY, et al., Defendants.**

**No. C–3–82–182.**

United States District Court, S.D. Ohio, W.D.

May 11, 1983.

Janet R. Sorrell, Toni M. Tell, Dayton, Ohio, for plaintiff.

Kenneth R. Pohlman, Asst. Pros. Atty., Howard P. Krisher, Dayton, Ohio, for defendants.

## DECISION AND ENTRY ON PENDING MOTIONS; PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT OVERRULED; DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SUSTAINED IN PART AND OVERRULED IN PART; NEW TRIAL DATE SET

RICE, District Judge.

This matter involves an action by Plaintiff Ralph Elam, under 42 U.S.C. § 1983,[1] against several Defendants, for an alleged deprivation of his federal constitutional right to retain custody of his minor child. Both Plaintiff (Doc. # 8) and Defendants (Doc. # 10) have moved for summary judg-

ment, pursuant to Fed.R.Civ.P. 56. For the reasons set out below, Plaintiff's motion is overruled, while Defendants' motion is sustained in part and overruled in part.

## I. FACTUAL BACKGROUND

An examination of the record reveals the following relevant facts. Plaintiff Elam and Cynthia Wiggins (nee Elam) were married in 1975, and had one child, Amelia (or Amy), born in January of 1976. Sometime in mid-1976, the Elams separated, and Cynthia left for Colorado, taking Amy with her. Since then, Plaintiff has been in only sporadic contact with his wife and daughter. In March of 1981, Cynthia filed a petition for dissolution of the marriage in a Colorado court. By Court order of August 18, 1981, the marriage was dissolved, and custody of Amy was "granted" to Cynthia. However, in the same decree, the Colorado court retained jurisdiction over, *inter alia*, child custody, "until such time as the Court obtains personal jurisdiction over" Plaintiff. This order was apparently promulgated under the Colorado enactment of the Uniform Child Custody Jurisdiction Act (UCCJA). Cynthia also served a child support claim, which she filed in a Colorado court, upon Plaintiff through a Montgomery County (Ohio) court. This action was taken under the Uniform Reciprocal Child Support Act. Plaintiff had been served with the latter papers, and had heard, through the "grapevine," of the formal dissolution of his marriage.

In January of 1982, Plaintiff was told by his ex-wife's sister that Amy was in need of a home (the circumstances of Cynthia having "left" Amy, at least temporarily, are not clear from the record). Plaintiff arranged for Amy to be sent to Ohio, where she stayed with him for a number of weeks. On March 19, 1982, Cynthia returned to Ohio, and requested the aid of

---

**1.** Section 1983 provides, in pertinent part, that Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the dep-

rivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (1976 & Supp. IV 1980).

Defendant Cynthia Fosberg, a deputy in the Montgomery County Sheriff's Department, in order to locate her daughter. Fosberg obtained the aid of fellow deputies, Defendants P.G. Snyder and Raymond E. Girard. They went by car, in the company of Plaintiff's ex-wife, to Plaintiff's residence in Dayton, at about 11:30 at night.

Here the parties' versions of the events which gave rise to this lawsuit diverge. Defendant Snyder knocked on the front door, and went around to the back when Plaintiff, roused from his sleep, told him that the front door would not open. Plaintiff permitted the deputies to enter his kitchen through the back, but did not let his ex-wife in the house. The Defendant deputies argue that they merely acted as "mediators" and "peace officers" to aid in "resolving" a family dispute. They acknowledge that they were *not* purporting to enforce any court order, of Ohio or of Colorado, under the UCCJA,[2] although they did have the aforementioned Colorado decree in their possession and showed it to Plaintiff. Girard Deposition at 25; Fosberg deposition at 16. Defendants state that they told Plaintiff they would *not* forcibly take the child, although they admit that Plaintiff was told it might be "appropriate" for him to "acknowledge" the Colorado court order. Snyder deposition at 9; Girard deposition at 11, 17, 25; Fosberg deposition at 15. Moreover, Plaintiff did *not* tell them that Amy could *not* leave. Girard deposition at 12, Fosberg deposition at 13. After a discussion of approximately 20 minutes, Amy, now awake, ran out of the house to her mother. Defendant Fosberg aided in gathering Amy's clothes, and Defendants soon left the residence. Throughout the whole episode, Defendants emphasize the lack of coercion involved, their "bystander" status, and that they would have left had Plaintiff asked them to do so. Snyder deposition at 8, 13. They point out that no weapons (such as "billy clubs") were involved, although they were carrying large flashlights. Snyder deposition at 2–3; Girard deposition at 8, 18.

Plaintiff's version of these events differs dramatically from that given by Defendants. After he let them in the door, Plaintiff claims that the deputies, with billy clubs drawn, told him that they had come "to get Amy." Plaintiff's deposition at 76, 79, 80–81, 94–95, 108. He also states that they did *not* tell him Amy would *not* be forcibly taken, id. at 79, 88–89, and that he was told to "let her go" when Amy ran out of the house. Id. at 83–84, 90–91, 100. Plaintiff emphasizes the coercive nature of the whole affair: he alleges his fright at being in the presence of uniformed officers late at night, id. at 94, 106–07, and that despite being shown certain papers, he agreed to nothing, id. at 85–88, and only permitted Amy to leave for fear of his being beaten. He acknowledges that the conversations were calm, and that he was not touched or physically threatened by the deputies. Id. at 82, 91, 99, 106. He also states that he has not seen or heard of his daughter since the episode. See also, Plaintiff's affidavit, attached to Doc. # 8.

Shortly after these events, Plaintiff filed suit in this Court, under 28 U.S.C. § 1343 and 42 U.S.C. § 1983. Named as Defendants were the aforelisted deputies, as well as Tom Wilson, Montgomery County Sheriff, the Sheriff's Office, the Montgomery County Board of Commissioners, and Montgomery County. After reiterating his version of the events on March 19, 1982, Plaintiff set out three claims which, he alleged, established violations of his rights under the Fourteenth Amendment to the United States Constitution, and § 1983. The claims were that Defendants, acting under color of state law, (1) improperly deprived him of his custody to his child without a valid Ohio court order, (2) "willfully and recklessly caused an invalid foreign Court Order to be enforced," and (3) engaged in "reckless, excessive, and oppressive conduct." Complaint, ¶¶ 18–28. Relief in the form of monetary damages and attorneys fees was prayed for.

2. These statements seem to conflict with Defendants' arguments, in their memorandum, that they *were* giving effect to the Colorado court order. Doc. # 10, pp. 17, 19.

## II. DEFENDANTS' MOTION IS OVERRULED IN PART AND SUSTAINED IN PART

When considering Defendants' summary judgment motion, this Court must construe all the evidence in the record and inferences drawn therefrom in the light most favorable to the Plaintiff. *Board of Educ. v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982); *Atlas Concrete Pipe, Inc. v. Au & Son, Inc.*, 668 F.2d 905, 908 (6th Cir.1982). The motion can only be sustained if Defendants conclusively demonstrate that there exist no genuine issues of material fact, and that they are entitled to judgment as a matter of law. Fed.R. Civ.P. 56(c). Defendants advance several grounds in support of their motion; these will be considered seriatim.

### A. *Domestic Relation/Child Custody Exception to Federal Jurisdiction*

At the outset, Defendants argue that this case is "in essence a custody dispute," since it requires this Court "to review adjudicated facts relating to substantive custodial rights . . . ." Defendants' Motion for Summary Judgment, Doc. # 10, pp. 12, 14. As such, they contend, this case falls under the rule that "[f]ederal courts traditionally decline to accept jurisdiction in parent-child, domestic relations or custody disputes and in adoption matters which are subject to state law and state court disposition." *Zak v. Pilla*, 698 F.2d 800, 801 (6th Cir.1982) (per curiam).

■ This Court cannot agree. In this Circuit, the exception has been applied in such diverse situations as a § 1983 action against a probate judge, *Tonti v. Petropoulous*, 656 F.2d 212 (6th Cir.1981), a § 1983 action against an adoption agency, *Zak v. Pilla, supra*, a diversity suit for unfulfilled obligations under a divorce decree, *Firestone v. Cleveland Trust Co.*, 654 F.2d 1212 (6th Cir.1981), a § 1983 and habeas corpus action to obtain custody of children, *Huynh Thi Anh v. Levi*, 586 F.2d 625, 632 (6th Cir.1978), and a § 1983 and diversity action concerning an intra-family dispute, *Denman v. Leedy*, 479 F.2d 1097 (6th Cir.1973) (per curiam). *See generally*, 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure §§ 3609–3610 (1975). However, the exception does *not* apply to suits · which have only domestic relations overtones, *Firestone, supra*, 654 F.2d at 1216, and are, in essence, suits for tort or contract. *Lloyd v. Loeffler*, 694 F.2d 489, 492–94 (7th Cir.1982); *Bennett v. Bennett*, 682 F.2d 1039, 1042 (D.C.Cir. 1982); 13 C. Wright, A. Miller & E. Cooper, *supra*, § 3609 at 667.

■ Plaintiff's § 1983 lawsuit, alleging that the Defendants committed constitutional torts by wrongfully depriving him of the custody of his minor child, clearly is not a "custody dispute." He is not asking this Court to return custody of his child to him, or to adjudicate whether he or his ex-wife was or is a more fit parent for Amy. Instead, he requests this Court to determine if Defendants committed certain torts, and to award a damage remedy to compensate him as a result thereof. While this case has "overtones" of a custody dispute, it sufficiently partakes of a typical § 1983 lawsuit, to determine constitutional violations, so as to make the "domestic relations" exception to federal court jurisdiction inapplicable. Accordingly, Defendants' first branch in support of its motion is overruled.

### B. *Requisites of a Section 1983 Lawsuit*

Assuming proper subject matter jurisdiction in this Court, Defendants advance several interrelated arguments that Plaintiff has not met the requisites of a § 1983 lawsuit. As this Court reads their arguments, they contend that no constitutional rights of Plaintiff are invaded, that other available remedies indicate that any such deprivation was accomplished by "due process of law," that any such deprivation was not accomplished under color of law, and that, in any event, they are entitled to "good faith" immunity. For the reasons set forth below, the Court does not find these arguments to be well taken with respect to portions of Claims 1 and 2 of the Complaint; however, the Court does find that, in light of these arguments, the mo-

tion must be sustained with respect to parts of Claim 1 and Claim 2 and all of Claim 3.

■ "Two essential elements must be pled and proven by a plaintiff to recover under 1983." *Dunn v. State of Tennessee*, 697 F.2d 121, 125 (6th Cir.1982), *cert. denied sub nom. Wyllie v. Dunn*, —— U.S. ——, 103 S.Ct. 1778, 76 L.Ed.2d 349 (U.S. 1983). First, there must be a deprivation of plaintiff's "... rights, privileges, or immunities secured by the Constitution and laws ..." of the United States. Second, the plaintiff must allege that the defendants deprived him of this constitutional right "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." *Id.; Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981); *Watson v. McGee*, 527 F.Supp. 234, 238 (S.D.Ohio 1981).

■ It is settled "that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1393, 71 L.Ed.2d 599 (1982) (citing cases). This right includes the interest of a parent in the "companionship, care, custody and management of his or her children." *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972). Accordingly, numerous courts have entertained § 1983 actions by parents, alleging that the state removed children from their custody without due process of law. *See, e.g., Ellis v. Hamilton*, 669 F.2d 510, 512 (7th Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982); *Duchesne v. Sugarman*, 566 F.2d 817, 824–25 (2d Cir.1977).

■ Defendants attempt to distinguish these cases by arguing that the alleged

deprivation occurred in accordance with the Colorado custody decree and the UCCJA. Doc. # 10, pp. 17–19.[3] In contrast, Plaintiff argues, *inter alia*, that the Ohio statutes enacting the UCCJA, Ohio Rev.Code Ann. § 3109.21–.37, were *not* complied with. Defendants' arguments are unconvincing. Plaintiff's liberty interest is not dependent for its existence on the procedure established by the State of Ohio. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982). More importantly, Defendants acknowledge that they were not enforcing the Colorado decree, or acting pursuant to any provision of the UCCJA. Thus, Plaintiff clearly had a liberty interest in the custody of his daughter.[4]

Assuming that Defendants were acting under color of state law, a question to be addressed shortly, they could only deprive Plaintiff of his liberty interest through "due process of law." *Santosky v. Kramer, supra*, 455 U.S. at 754, 102 S.Ct. at 1394. Defendants argue that Plaintiff has various remedies open under Ohio law, and the UCCJA, to regain (or to have retained) custody of his daughter. Based on their reading of *Parratt v. Taylor, supra*, they conclude that these procedures satisfy any "due process" requirements. Defendants err in their reading of *Parratt*. That case, dealing exclusively with *procedural* as opposed to *substantive* due process, involved a state prisoner who filed a § 1983 action, alleging that officials had deprived him of property without due process of law, by negligently losing his "hobby kit." The Supreme Court held that a pre-deprivation hearing was not required, since Taylor's deprivation was not the result "of some established state procedure," but rather

---

**3.** Defendants also repeatedly argue, based on various facts gleaned from the record, that Plaintiff is not a fit parent for Amy, and should not have an interest in continued custody over her. This inference is incorrect. "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents ...." *Santosky v. Kramer*, 455 U.S. at 753, 102 S.Ct. at 1393. In addition, as the Court explained earlier, Plaintiff's lawsuit does not require this Court to de-

termine his fitness as a parent, or the proper custody of Amy.

**4.** For the same reasons, Plaintiff's discussion of the UCCJA is largely, if not completely, besides the point. Indeed, if Plaintiff were only arguing that the Ohio enactment of the UCCJA had not been followed, no federal constitutional claim would be at issue. *Bills v. Henderson*, 631 F.2d 1287 (6th Cir.1980).

"occurred as a result of unauthorized failure of agents of the state to follow established state procedure." 451 U.S. at 543, 101 S.Ct. at 1917. Taylor's post-deprivation remedy, in the form of a right to bring a tort action against prison officials in state court, provided him with due process of law. *Id.* at 543–44, 101 S.Ct. at 1917.

However, *Parratt* does not stand for the proposition that the existence of any post-deprivation remedies satisfies due process of law under the Fourteenth Amendment, for deprivation of a *liberty* interest, or of a *substantive* constitutional right. *See, Parratt, supra,* 451 U.S. at 545, 101 S.Ct. at 1918 (Blackmun, J., concurring); *Logan v. Zimmerman Brush Co., supra,* 455 U.S. at 436, 102 S.Ct. at 1158. *See also, Wilkerson v. Johnson,* 699 F.2d 325, 329 (6th Cir.1983) (*Parratt* holding confined to "prisoners' rights context"); *Watson v. Mcgee, supra.* An excellent and thorough discussion of *Parratt,* also reaching this conclusion, appears in a recent decision by Judge Prentice H. Marshall: *Begg v. Moffitt,* 555 F.Supp. 1344 (N.D.Ill.1983). Here, Plaintiff is clearly relying on the *liberty* interest to the custody of his child; relying upon his right to substantive as opposed to procedural due process. He is not merely arguing that certain procedural protections were not afforded him, or that he was deprived of a "property" interest. Accordingly, even assuming, arguendo, the correctness of Defendants' characterization of certain remedies available to Plaintiff, his due process rights are not satisfied by the opportunity to exhaust said remedies.

Finally, the Court reaches Defendants' most persuasive argument. The deputies assert that they were merely exercising their authority as "peace officers" under Ohio law. Ohio Rev.Code Ann. §§ 109.71, 311.08, and were essentially "mediators," Doc. # 10, p. 19, in a family dispute. Cast in terms of a § 1983 lawsuit, Defendants appear to argue that they took no part in any alleged deprivation or, in other words, that no "state action" or acts performed "under color of law" occurred.[5] This argument also overlaps, in large part, with their contention that they performed no "coercive" acts, meaning that they could not have "deprived" Plaintiff of any constitutional rights.

■ In general terms, the Fourteenth Amendment can only be violated by conduct "that may be fairly characterized as state action." *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 102 S.Ct. 2744, 2747, 73 L.Ed.2d 482 (1982). Put another way, Plaintiff must demonstrate a "sufficiently close nexus" between the state and the conduct which allegedly deprived him of his constitutional rights. *Id.* at 2755; *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974); *Heflin v. Kentucky State Racing Comm.,* 701 F.2d 599, 600 (6th Cir. 1983) (per curiam).

Counsel did not cite, and this Court has been unable to discover, any published case law addressing the issue of "state action" or "coercion" in circumstances similar to the within matter. However, there is a body of law addressing the "coercive" nature of official action. A "consent" by persons to being searched or seized by police is an exception to the warrant requirement of the Fourth Amendment. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). The voluntariness of consent, and the absence of coercion, is typically determined by examining "the totality of all the surrounding circumstances." *Id.* at 226, 93 S.Ct. at 2047. In such cases, courts have looked at, *inter alia,* whether police made a "show of force," were present in large numbers, displayed weapons, took action at night, and the like. 2 W. LaFave, Search and Seizure § 8.2(b) (1978). (Defendants also make analogy to the criminal law, arguing that the deputies had "probable cause" to "intercede on behalf of the child." Doc. # 10, p. 22).

---

5. Section 1983 reaches actions performed "under color of state law." The Fourteenth Amendment prohibits certain action by the "state." If public officials are sued, as herein, in a § 1983 action for violations of the Fourteenth Amendment, the two inquiries are identical and collapse into one. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982); *Coon v. Froehlich,* 556 F.Supp. 115, 118 (S.D.Ohio 1983).

In examining the record herein for similar elements, the Court finds that there are genuine issues of material fact regarding the presence of consent. It is undisputed that the March 19, 1982, encounter occurred late at night, and that the defendant deputies, three in number, were in uniform. These facts, taken alone, would probably not establish a coercive atmosphere. However, if other facts asserted by Plaintiff are true, they *could*, in this Court's judgment, establish a coercive atmosphere, when considered together with the undisputed facts. As summarized above, Plaintiff's versions of his encounter with the deputies (what with drawn weapons and barked commands) greatly differs from Defendants' version.[6] The finder of fact at trial must determine which version, in whole or in part, is the correct one. Once such findings of fact are made, the Court will be able to determine if the Defendant deputies "deprived" Plaintiff of his liberty interest in a coercive manner and, similarly, whether there was "state action" in the alleged deprivation of said interest.

### C. *Application to Plaintiff's Complaint*

The above analysis requires that the Court sustain in part, and overrule in part, Defendants' motions for summary judgment. Perhaps because it was filed without a full appraisal of the factual circumstances, Plaintiff's complaint, with the benefit of hindsight, is not a model of clarity. The first and second claims therein (alleging, in part, deprivation of a right without valid Ohio or foreign court orders, respectively) appear to be, in part, beside the point; as noted above, Defendants were not purporting to enforce *any* court order. (On the other hand, Plaintiff is probably correct in intimating that *if* Defendants *were* enforcing a valid court order under the UCCJA, there would be no due process violation. *Cf.* Note, *The Due Process Dilemma of the Uniform Child Custody*

*Jurisdiction Act*, 6 Ohio North. L.Rev. 586 (1979)). To the extent Plaintiff is alleging that he was "improperly" and "coercively" deprived of a constitutional right (a combination of language in Claims 1 and 2), his § 1983 action can go forward, and Defendants' motion is overruled. However, other aspects of said motions are well taken.

First, Plaintiff has not established a link, through a "policy," "custom," or direct participation, between the deputies and the Defendants County and County Board of Commissioners. With no such facts alleged in the complaint or developed in the record, those Defendants must be, and are, dismissed. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Hayes v. Jefferson County*, 668 F.2d 869, 874 (6th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982). Likewise, the Defendant "Sheriff's Office" is a subunit of Montgomery County, and appears not to be an entity, in and of itself, subject to suit. Accordingly, that Defendant is dismissed, as well. However, Defendant Wilson will *not* be dismissed. Plaintiff alleges that Sheriff Wilson was charged with "supervising" the deputies (Complaint, ¶ 5). From the balance of the complaint, Plaintiff appears to argue that no valid supervision or "training" took place. *See also*, Plaintiff's Summary Judgment Motion, Doc. # 8, p. 8. A "complete lack of training" by a supervisor can be sufficient to attach liability under § 1983 for a subordinate's unlawful acts. *See, Hayes v. Jefferson County, supra; Melson v. Kroger Co.*, 550 F.Supp. 1100, 1103–04 (S.D.Ohio 1982). Here, the deputies stated in their depositions that they had training in "domestic relations" matters in general, but no specific training to enforce court decrees under the UCCJA. Snyder deposition at 13; Girard deposition at 24; Fosberg deposition at 17. Thus, dismissal of Defendant Wilson is not appropriate.

Second, Plaintiff appears to allege, in Claim 3 of his complaint, that Defend-

---

6. The Plaintiff's alleged subjective "fright" also appears relevant, taken together with other facts, to the nature or existence of a coercive atmosphere. *Schneckloth v. Bustamonte, supra,*

412 U.S. at 226, 93 S.Ct. at 2047; 2 W. LaFave, *supra*, § 8.2(e). On the other hand, such subjective factors appear to be irrelevant to the existence of excessive force. *See,* text, *infra.*

ants used "excessive" force in depriving him of his rights. While the *coercive* nature of the deputies' actions is a matter of dispute, they did *not* use "excessive force," at least as that term has developed in the case law. Plaintiffs in § 1983 actions can bring suit predicated on "[a]llegations of assault and battery and use of excessive force ... when such actions were severe." *Tefft v. Seward,* 689 F.2d 637, 639 n. 1 (6th Cir.1982); *Melson v. Kroger Co., supra,* 550 F.Supp. at 1105. However, whether such force is "excessive" appears to be based on an objective or "reasonable" examination of the facts. *Hamilton v. Chaffin,* 506 F.2d 904, 909, 912 (5th Cir.1975); Annot., 60 A.L.R.Fed. 204, 212 (1982). Thus, Plaintiff's alleged *subjective* fear of being physically threatened is, taken alone, irrelevant. As summarized above, Plaintiff acknowledges that the deputies took no actions which physically threatened his life or safety. Accordingly, the Court holds that Defendants are entitled to judgment on any sort of "excessive force" cause of action Plaintiff may have wished to pursue.

To summarize, Defendants' summary judgment motion is sustained in part, to the extent that Plaintiff seeks to recover for the deputies' alleged use of excessive force, for their improperly enforcing certain court orders, or to recover from Montgomery County, the Board of Commissioners, and the Sheriff's Office. The motion is overruled in all other respects. This case remains viable as a § 1983 action against the three named Sheriff's deputies and Sheriff Wilson.

Finally, it should be noted that Defendants argue that, assuming the deputies committed a constitutional violation, they are entitled to "good-faith" immunity. To reach this issue would be premature. As the Supreme Court has recently stated, *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), such immunity is now governed by the "objective reasonableness of an official's conduct, as measured by reference to clearly estab-

lished law." *Id.* at 2739 (footnote omitted). *See generally, Truss v. Collier,* 574 F.Supp. 1249, 1261–62 (S.D. Ohio 1983). Until the events of March 19, 1982, are established by the finder of fact at trial, an "objective" appraisal of the deputies' conduct as a matter of law, is difficult, if not impossible.[7]

### III. PLAINTIFF'S MOTION IS OVER-RULED

Plaintiff has moved for summary judgment on the first two claims of his complaint. To sustain such motion would be improper. As previously noted, Plaintiff alleges in those claims that the deputies improperly enforced an "invalid" foreign and/or Ohio court order. However, the deputies have stated that they were not purporting to "enforce" any court order. Moreover, the alleged coerciveness of their actions is a matter of profound factual dispute. Since such dispute cannot be resolved by way of summary judgment, Plaintiff's motion must be, and hereby is, overruled.

### IV. CONCLUSION

The facts of this case demonstrate the wisdom of the reluctance of federal courts to intervene in "domestic relations" or "custody" disputes. Many, if not most, commentators believe that the use of federal civil rights actions in such disputes is unnecessary and counterproductive, and that these disputes should be left to resolution by informal means, or by state courts. *Santosky v. Kramer, supra,* 455 U.S. at 770, 102 S.Ct. at 1403 (Rehnquist, J., dissenting); Hafen, *The Constitutional Status of Marriage, Kinship, and Sexual Privacy—Balancing the Individual and Social Interests,* 81 Mich.L.Rev. 463, 500 (1983). *Cf. Developments in the Law—the Constitution and the Family,* 93 Harv.L. Rev. 1156 (1980).

Here, Defendants also invoke these principles, and ask this Court to refer Plaintiff

---

**7.** There is no question that the test established by *Harlow v. Fitzgerald* applies to state officials sued in a § 1983 action, 102 S.Ct. at 2738–39 n. 30; *Truss v. Collier, supra,* at 1261 n. 15, or that

*Harlow* applies to all pending cases. *Wolfel v. Sanborn,* 691 F.2d 270 (6th Cir.1982) (per curiam).

to other remedies, principally, the UCCJA. However, it was the Defendant deputies *themselves* who circumvented such procedures, by purporting to "mediate" a "family dispute" at 11:30 at night. Had the deputies waited till the next day (they offer no reason for the rush to resolve the "dispute"), or otherwise complied with and/or enforced the UCCJA, they probably would not be in this Court. Whether the actions which they *did* take were improper can only be resolved at trial.

Trial of this case, previously set for April 18, 1983, is reset for the week of July 18, 1983.